You may proceed. All right. Good morning, Your Honors, and may it please the Court. My name is Arthur Hawgood and I represent Jammin Java Corporation. We've brought this appeal principally to challenge the award of damages of approximately $2.45 million to the 56 Hope Roads based on trademark infringement. And the reason that we're challenging the damages award here is that there was no finding of willfulness against Jammin Java that would support a disgorgement of profits award, which is essentially what the Court came to the conclusion here. Taking plaintiffs' arguments in the light that I understand them, they seem to be saying that there are two pathways for them to get to disgorgement of profits under the Lanham Act. And the first is Section 117, Subsection 1, which actually states profits, and then the second is the actual damages under Section 117, Subsection 2. And the district court here awarded actual damages, it looks like, under Section 2, despite the fact that there was no finding of willfulness and no showing that the profits were a proxy for the damages caused by the nonpayment of the royalties here. So the error here, if I think, is that the district court needed to ask and the plaintiffs needed to show that profits were an appropriate measure of damage because their damages were difficult to prove. If we look at the case law that started this in Liddy Penn, the Court actually stated in Liddy Penn that you can use profits as a proxy for damages, but only if it's difficult to prove what your actual damages are. And it makes sense from a policy perspective  and that person made a profit off of the selling of that product, those damages would be roughly approximate to what the losses were for the other side. This case is different because they weren't direct competitors. Jam & Java licensed the Marley brand in order to... Was Hope Roads also selling coffee? No. Okay. So Jam & Java was selling coffee under that brand. Correct. Jam & Java was selling coffee under that brand. 56 Hope Roads simply licensed their intellectual property to Jam & Java. Jam & Java stopped paying due to financial insolvency issues. I look at the SEC filings. Jam & Java never made any money. There was no profit here. According to the affidavit submitted by the former president on Tran, over the course of selling this coffee product, Jam & Java actually lost $37 million. Looking at the infringing period, Jam & Java lost over $1 million during the trademark infringement period that 56 Hope Roads is claiming that they can be compensated for. And so there were no profits. Getting to profits the way that the court got to them is through this, you know, multiple step process that almost amounts to a legal fiction where you're saying, the first is, is this an approximation for profits for the losses under Section 2, 117 subsection 2, and then after that the court said, well, you didn't prove Jam & Java your offsets on profits enough, so we're going to just assume using this fiction that your profits were the entirety of your revenue, which was $2.4 million. And that might be appropriate in a case where there is a direct competitor relationship, as I've stated, but here where there is no direct competitor relationship and the parties have already entered into a contract to license the trademark, it's easy to see what the plaintiff's damages would be, and that's their actual damages would go to the royalty rate, which was set in the contract, and that's 3%, or 3% of $2.4 million. So the ruling here, in essence, gave... So to unpack the ruling here, what the district court recognized was that your argument, or what it seemed to recognize was that your argument was not that profits was an inappropriate measure of the trademark infringement damages as a matter of law, but that that should not be a measure of damages because defendant, in fact, did not have any profits, which is kind of what you're arguing here. But the district court went on to say you haven't shown that you didn't have any profits because you didn't admit or seek to admit any evidence of offsets, like your expenses that would show the true value of profits, which in your view, which you're arguing now, is zero. I think that it's correct that the district court said that we didn't prove our case on that point at the trial. We submitted an affidavit from the president of the company indicating that the Marley brand was the only work that the company was doing at the time of the infringing use. As it turns out, that was a misstatement to some degree that Marley Coffee wasn't the only product they were making. Once the litigation started, they actually started looking toward creating a jam and java coffee brand. I think that Judge Wilson, because of that, because there was some evidence that there was money spent on another brand, the affidavit was sort of discarded, not relied on. Did you put in evidence of your expenditure so that you could come up with a correct profit loss? We did. We submitted it with the affidavit along with the SEC filing showing what our profits were, but the distinction came down to the fact that there were two brands that my client were working on, the one, the Marley brand that they were using the trademark to, and then after the litigation started, they sort of went off with plan B. Plan B was called jam and java coffee. So in essence, that small portion where they started spending some amount of employee time and hours to create a new brand, because we weren't able to separate that brand from the rest of the work on Marley Coffee, the district court said we couldn't prove what our profits were and entered an award saying that the profits were $2.45 million, despite the fact that the objective level of profits from the SEC filing showed that the company really never made any money. And also the fact that the company never made any money was part of the analysis of why your client was found in breach of the long-term and short-term losses because it never made any money, so it never paid any royalties. Correct. Because of the financial insolvency, they weren't able to pay those royalties, and they became liable for trademark infringement, and then the trademark infringement judgment essentially said we're going to take the revenue, call it profits. But I think that that goes too far, as I think that the plaintiffs here needed to show either willfulness to get damages under Section 1171, which this court recently in Omnia v. Stonecreek stated unequivocally the willfulness is a requirement for disgorgement. And so the alternative here is to find another way to get the profits, looking at the case history from Lady Penn, to do that. The cases cited by the plaintiff, those are all cases where there's a direct competitive relationship, and that matters because those cases you can have an actual argument for why it might be difficult to prove your actual damages. How much money did your competitors make, and therefore how much money did you lose? But here the parties, an arm's-length negotiation with counsel, entered into licensing agreements where they agreed that the actual damages would be 3 percent. I won't call them damages, but that was what the revenue was going to be, 3 percent payment from Jam & Java to Marley Coffee. Now, I want to address specifically that the plaintiffs here say that we've waived this argument about damages because former counsel of the trial court indicated that he thought that profits were what was left over after the summary judgment decision here. And he did state that in a status conference, but I take that he was referring to subsection 1 of the Lanham Act here, which is where it actually says profits in the statute. In order for them to get to that, they needed to show willfulness. So it wasn't a concession that they're entitled to a money award. It was a concession that this is the next step in the litigation process. We're going to go look at what the damages are, and that's profits. That doesn't mean that we ever waived the requirement that willfulness be proven in order for there to be disgorgement. The alternative theory of statutory construction here, the plaintiffs are advancing, is that you can have a requirement for willfulness under Section 117.1, but alternatively, whenever you want, you can get actual damages or get profits through actual damages without showing willfulness. And to me, that's an absurd result. If the statute has a standard that requires willfulness for one, you can't backdoor a non-willfulness into the subsection. So why didn't you introduce evidence of the expenses attendant to each of the separate products? I mean, that would have helped offset that figure under the theory that the judge was using. At the time that the trial court memorandum was written and done, Mr. Tran was no longer working for the company, and the statement that he made to support this was that JAM and JAVA was the only work that they were doing. If that statement had been truthful, there would have been no need to show specific offsets about profit, because there was no profit. The SEC filings themselves would prove there was no profit if their only business was Marley Coffee. And that's exactly what the district court said. That's what the district court said. But I think that the district court missed a prerequisite step of that analysis, which was showing that it was difficult to prove 56 Hope Road's damages. And so we need to come up with a proxy for those damages. And for that proxy, we're going to look to profit. Because it may have been that 56 Hope Road was not damaged in any way. It may have been that 56 Hope Road was not damaged in any way. Or I think it's easy to say that at the worst amount of damages, they were only ever entitled to 3 percent of the royalty fee that they had negotiated. You know, not a $2.4 million windfall. And those arguments before the district court? Well, at the district court level, it was our perception that we were litigating over disgorgement of profits under Subsection 1 of the statute. So we didn't make the argument about what their alternative amount of damage should be, because they didn't ask for it. It seems to me that they took a risk, a tactical decision, to go for the big win, which is this $2.4 million win, without arguing supplementally that they should at least be entitled to a smaller percentage pursuant to the royalty contract. In making that tactical decision to pursue the windfall that they ultimately were awarded, they didn't prove willfulness. And so I don't see how they get there through the alternate way without showing at Step 1 that there is some correlation between the revenue and their actual damages. Because we have to start with statutory language. Statutory language, Subsection 2 says actual damages. And the case law requires that there be some level of fit between the actual damages and what the losses here were. There's no allegation here in the record at all that anybody thinks the $2.4 million were anywhere close to their actual damages. There's no argument about why that fits. It's really just an application of the case starting with Letty Penn, which I will acknowledge that those cases allow for you to calculate profits in cases where you're a direct competitor. But there's no direct competition here. And because of that, they needed to show that there was some connection to the revenues that correlated to plaintiff's injury. And they didn't show that. You want to save some time? I would like to point out one thing, too, that they pointed out in their brief, just for the Court's attention. On page 25 of our brief, I cited to McCarthy on trademarks for the proposition that courts allow royalty calculations for damages. And I cited the case which was wrong. The actual case that the quote came from was Choice Hotels International, Inc. v. Patel, and that's 940F Supplemental 2D-532. It's a Southern District of Texas case. But it's really just quoting McCarthy on trademarks for the proposition that All right. A couple minutes there. Good morning, Your Honors. Bonnie Eskenazi of Greenberg Glusker on behalf of the Hope Road Companies. I would like to start with the concept of invited error. In this case, the trial court merely openly asked both parties, what do you think the measure of damages ought to be? And Mr. Francisco very clearly stated to the court that the measure of damages, he said, the right damages number, and I quote at the record at page 83, the right number, the right damages number, which under the law is essentially profits, and so it's just a matter of the parties working through the documents to get what the right number is in terms of the profits attributable to the use of the mark. In addition, even when Mr. Hawgood was involved, the court again addressed the issue of the appropriate measure of damages. And in that case, essentially Mr. Hawgood also admitted that willfulness was not a requirement when you're looking at profits. And so, and that is at the record at 103, the court says the argument involved, whether the disgorgement of profits is an automatic remedy. And the court says, so if it's not automatic, how then is it to be assessed? And Mr. Hawgood replied, well, the case law is murky, Your Honor. On this issue. But in essence, it appears that it's in the sound discretion of the trial court's judgment. The reason that this is important is that the court then gave us all time, three months, to go and do discovery on what damages should be. And all of our energies, all of them, were focused on profits. Now, if there had been an issue of whether there's a question of willfulness, we could have done discovery on willfulness. But we didn't because everybody had agreed, and the court says repeatedly, everyone here agrees that profits is the correct measure of damages. And in fact, and in fact. What if everyone agrees to a wrong statement of law? I don't think it is a wrong statement of law. So, if you. I mean, usually profits could be a measure if they were competing. But here, Hope Roads wasn't even selling coffee. That's not entirely correct, Your Honor. So, Hope Road was not selling, was not distributing the coffee, was not involved in the licensing directly before it terminated the contract. Now, the Jam & Java was not making coffee, was not distributing coffee. They were simply a middleman. They were sub-licensing to various companies. And once we terminated the contract, and that was when the measure of damages took place, our appropriate measure of damages is essentially their profits because we could step into their shoes, which is exactly what we did eventually. But during that time period, we couldn't. Oh, I see. Because they weren't making and selling coffee. Exactly. They were just sub-licensing. They were just sub-licensers. Which you could have done. Which we could have done and which we have now done. We have stepped into their shoes, and so our measure of damages is essentially what they made. But what about the fact that they were bankrupt during this time? Well, there's a question about whether they were bankrupt. Okay. And the other thing that I'd really like the court to understand is that what they owed us previously were actually royalties. It wasn't a guaranteed minimum, and so they had been collecting this money as of the prior determination that actually belonged to us, whatever that percentage was. And they spent our money, essentially, without telling us. But after that period of time, what they owed us was money that was attributable to the profits of Marley Coffee. The other point that I'd like to make, Your Honor, is that Mr. Hawgood's statement that it was only after the litigation ensued that they started selling and developing Jam & Java Coffee is not true. If you look at the record, it shows that they began licensing and distributing and marketing Jam & Java Coffee, the competitive coffee, way back in November of 2014. So what we discovered along the lines, along this period of time, is that Mr. Tran's statement that the only thing they did was Marley Coffee was simply untrue. And he was there during that time. He was actively involved from November 2014 all the way through this litigation proceeding. So he should have known, and he was, in essence, misleading us and misleading the court. And we submitted that evidence to the court. Now, when you're talking about profits, our job, our burden, was only to show what the revenues were. And frankly, we simply took Jam & Java's revenues. We didn't audit. We didn't argue. We said, okay, here are the revenues. Now the burden shifts to them. Can you show that there's expenses and an offset? And they didn't even try. They had that one declaration from Mr. Tran who basically said, well, everything. Everything is Marley Coffee, which we disproved. So they simply didn't meet their burden, and the court really could do nothing but rely on that. The court, once he found that Mr. Tran's declaration was untruthful, the court didn't have the power to then figure out what the expenses could have been because there was no evidence in front of the court. There was no evidence presented to us. They could have. We spent three months going through this, through these documents. And, you know, we did raise with Mr. Francisco, well, you know, which of these expenses were attributable just to Marley Coffee and not to other aspects. And we never got an answer to that. And there's not much that we can do or the court could have done in that case. So on the issue of the law, Lindy Penn and Addrey and a whole host of cases which continue from those cases show that there are really two ways to prove, to obtain the measure of damages as profits. One is if there is willfulness. But separate and apart from that, there's this whole section of law, this whole bunch of cases, which talk about being a proxy for plaintiff's damages. And at the time of termination, we stood in Jam and Java's shoes. We could have simply taken over those licenses or issued new licenses, which, in fact, we have done since that time. So whatever their profits were was a perfect measure of profits for us. And it's not our fault and it's not our burden to prove their expenses because we had no way of doing that. Unless Your Honors have additional questions, I have nothing further. No. Thank you. Thank you, Counsel. I would like to clarify that the statement on the record that I made, the statement that she's referencing to, is only that disgorgement is not an automatic remedy once willfulness is shown. It's still inside of the district court's discretion to decide, you know, whether to award that penalty damages or not and then how much they would be. It was certainly not a concession. Those type of profits were something that we should have entered. We vigorously argued at the district court level that they should not be there. You know, I proposed in the brief an alternative measure of damages, which are royalties, but those damages, I think the plaintiff originally should have proved those. I didn't need to make that argument at the trial court. And, you know, again, I think that the missing part here is when does the Lendy Penn line of cases come into effect? It cannot be as a matter of statutory construction that you have willfulness requirement for profits under the statute and then a separate actual damages requirement where there is no willfulness that you can always get the same results by choosing number two and just avoid the willfulness problem. That doesn't make any sense. There has to be something more, and the courts have said that something more is that it's difficult to prove the damages for the plaintiff, and so in certain circumstances where there is direct competitor, we will use the profits as a proxy. And, you know, this case is about a royalty. But your opposing counsel argues that, in fact, you were directly competing because you were both licensing the same intellectual property. Well, that's not an argument that she made at the district court at the damages hearing that I saw, and it had been my understanding that Jamin Jabba was selling coffee, so I can't make a statement about whether that's correct or not, but I do think that it wasn't raised at the trial court. The argument we had at the trial court, if I remember the briefing correctly, that there really was no justification ever for why the Lendy Penn line of cases applied to the plaintiffs. They just sort of took that case law and said, we can use it. But there are policy reasons behind the case law to justify getting around that willfulness requirement. You need something more, such as, you know, showing that this is a reasonable fit to their actual damages. And I don't think that we have that here. All right. Thank you, counsel. Thank you, Your Honor. Oak Road Merchandising v. Jamin Jabba is submitted.
judges: Tashima, Wardlaw, Pratt